UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
WARREN GOLDEN,                     :

                  Plaintiff,    :

      - against -      :

CITY OF NEW YORK, et al.,    :

              Defendants.   :
------------------------------------------------------------X

24 Civ. 5759 (LAK) (GS)

REPORT &
RECCOMENDATION

**GARY STEIN, United States Magistrate Judge:**

Defendants Alvin L. Bragg, Jr., the New York County District Attorney, and Assistant District Attorneys Nicholas Viorst and Jana Loeb (collectively, the "DA Defendants") move to dismiss this action with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 25.) For the reasons set forth below, the undersigned respectfully recommends that the motion to dismiss be **GRANTED** with leave to amend.

## BACKGROUND

### A. Plaintiff's Allegations[1]

Plaintiff Warren Golden ("Plaintiff" or "Golden") commenced this action on July 30, 2024 against the DA Defendants as well as Defendants the City of New York ("City") and Shaun Tanner, a lieutenant with the Internal Affairs Bureau ("IAB") of the New York City Police Department ("NYPD"). (Dkt. No. 1 ("Compl." or

---

[1] The information set forth in this section is taken from the allegations of the Complaint (Dkt. No. 1), which are accepted as true for purposes of this motion, and certain documents incorporated by reference therein, which are attached as exhibits to the Declaration of Madeleine Guilmain (Dkt. No. 25-1 ("Guilmain Decl.")).

1

"Complaint") ¶¶ 15-19).  The factual basis for Plaintiff's claims stems from an incident involving the theft of expensive bottles of champagne from a VIP table at the Electric Zoo Music Festival ("Festival") on Randall's Island on September 3, 2022.  (Compl. ¶¶ 24-25, 49).

Plaintiff, an NYPD detective, was on plainclothes assignment at the Festival. (*Id.* ¶ 24).  During this assignment, Plaintiff was present while two other NYPD detectives, Jonathan Gonzalez and Wojciech Czech, improperly took the bottles of champagne (allegedly valued at $2,900).  (*Id.* ¶¶ 25, 38, 42; Guilmain Decl. Ex. D). Plaintiff alleges that while he did not intervene in the moment, he did not engage in or encourage the conduct of the other officers in their taking of the bottles.  (Compl. ¶ 26).  After he was in a safe place to do so, Plaintiff encouraged Gonzalez and Czech to return the champagne bottles.  (*Id.*).

The incident triggered an investigation by the IAB, led by Tanner, who "worked hand-in-hand" with the Police Accountability Unit ("PAU") of the New York County District Attorney's Office ("DANY").  (*Id.* ¶¶ 18, 27-28).  Tanner allegedly encouraged the PAU, and specifically Defendant Loeb, to prosecute Golden.  (*Id.* ¶¶ 29-31).  Loeb is an Assistant District Attorney supervised by Defendant Viorst, who is the chief of the PAU and reports directly to District Attorney Bragg.  (*Id.* ¶¶ 18-19).

In early May 2023, a New York County grand jury indicted Gonzalez and Czech for Grand Larceny in the Fourth Degree and Gonzalez, Czech, and Golden for Official Misconduct.  (*See id.* ¶¶ 38, 49; Guilmain Decl. ¶¶ 8-9 & Ex. C

(Indictment)).  The crime of Official Misconduct is set forth in New York Penal Law § 195.00(2), which provides, in relevant part, that it is a class A misdemeanor for a public servant, "with intent to obtain a benefit or deprive another person of a benefit," to "knowingly refrain[] from performing a duty which is imposed upon him by law or is clearly inherent in the nature of his office."  N.Y. Penal L. § 195.00(2); (*see* Compl. ¶¶ 39, 41).  On or about May 15, 2023, Golden was arrested and arraigned on the charge of Official Misconduct.  (Compl. ¶ 47).

According to Golden, "there was never any evidence which amounted to Official Misconduct" on his part.  (*Id*. ¶ 42).  Rather, Golden "was merely present at the location and in proximity with others who were alleged to have commit[ted] a crime."  (*Id*.).  He claims Defendants "ignored the language, substance, and intent of" Penal Law § 195.00(2) and "inexplicably proceeded to wrongfully prosecute" him, including by allowing a witness to commit perjury before the Grand Jury.  (*Id*. ¶¶ 42-44).

On the same day Golden was arraigned, DANY issued a press release in Defendant Bragg's name regarding the Indictment and the underlying facts of the case.  (Compl. ¶ 48; Guilmain Decl. Ex. D (Press Release)).  The opening sentence of the Press Release states that Gonzalez, Czech, and Golden were indicted "for their roles in the theft of expensive champagne from the VIP area of the Electric Zoo Music Festival."  (Compl. ¶ 49; Guilmain Decl. Ex. D).  According to Golden, the statement that Golden had a "role" in the theft is "patently untrue," as "at no time was Golden ever charged with hav[ing] had a role in the theft."  (Compl. ¶ 50).

"This harmful and knowingly malicious statement still haunts [Golden] to this day, as anyone who searches his name will wrongly be led to believe that he was involved in the theft of expensive items, which is plainly not true." (*Id*. ¶ 51). The Complaint references several newspaper articles that Golden contends show he has been "directly and visibly falsely associated with stealing" as a result of the press release. (*Id*. ¶¶ 54).

On May 9, 2024, the DA Defendants moved to dismiss the Indictment against Golden, and the charges against him were dismissed. (*Id*. ¶¶ 58, 61). Loeb allegedly "admitted that [Golden] should never have been indicted" (*id*. ¶ 62) and, throughout the prosecution, "repeatedly make it clear that the Defendants' goal was to ensure that Plaintiff would no longer be a police officer" (*id*. ¶ 60). Golden alleges that his prosecution could have been avoided if the DA Defendants had only "followed and properly applied the law, instead of attempting to apply guilt by association and guilty until proven innocent tactics." (*Id*. ¶ 63).

Golden alleges a variety of harms from his allegedly unjust prosecution. He was suspended from the NYPD, preventing his advancement within the NYPD ranks, and remained under suspension as of the filing of the Complaint. (*Id*. ¶¶ 57-59). To this day, he still must explain what happened to those who inquire based on the continued "on-line presence of the maliciously false statement" about him. (*Id*. ¶ 65). Golden has also "suffered stress and strain, reputational damage, and loss of economic opportunity." (*Id*. ¶ 66).

Based on these allegations, Golden pleads five causes of action against the DA Defendants (as well as Lieutenant Tanner), including claims for (1) false arrest under 42 U.S.C. § 1983 (Compl. ¶¶ 68-78); (2) malicious prosecution under 42 U.S.C. § 1983 (*id.* ¶¶ 79-92); (3) malicious prosecution under state common law (*id.* ¶¶ 114-23); (4) abuse of process under common law (*id.* ¶¶ 124-36); and (5) gross negligence under common law (*id.* ¶¶ 137-47). These claims are brought against the DA Defendants in both their official capacities and their individual capacities. (*Id.* ¶ 22).

In addition, the Complaint asserts a *Monell* claim under 42 U.S.C. § 1983 seeking to impose municipal liability against the City (*id.* ¶¶ 93-113) and a claim for vicarious liability seeking to hold the City liable for the individual defendants' actions (*id.* ¶¶ 148-57).[2]

## B. Defendants' Instant Motion

The DA Defendants[3] filed their motion to dismiss on December 18, 2024, arguing that (1) Plaintiff's claims against them in their official capacities are barred by Eleventh Amendment sovereign immunity afforded to officials acting as agents of the state (Dkt. No. 25-10 ("DA Br.") at 4-5); (2) Plaintiff's claims against them in their individual capacities are barred by absolute prosecutorial immunity afforded to prosecutors acting within their prosecutorial function (*id.* at 5-6); and (3) to the

---

[2] The City is also named as a defendant on the two Section 1983 claims and the common law claim for abuse of process, but not on the common law claims for malicious prosecution and gross negligence.

[3] The City and Tanner have both answered the Complaint. (Dkt. No. 24).

extent Plaintiff's claims rely on the Press Release, those claims also fail on immunity grounds (*id.* at 6-8).  The DA Defendants further argue that Golden fails to plead personal involvement of the DA Defendants in the challenged conduct (*id.* at 9-10) and that each of the causes of action asserted against them fails to state a claim as a matter of law.  (*Id.* at 10-17).[4]

In support of their motion, the DA Defendants included a declaration from their litigation counsel, providing, *inter alia*, a narrative of events relating to DANY's prosecution of Golden and attaching various documents from the criminal case, including the transcript of the May 15, 2023 arraignment, DANY's May 2024 Recommendation of Dismissal, the Indictment, the Press Release, the briefs on Golden's motion to dismiss the Indictment, and the Criminal Court's decision on that motion.  (Guilmain Decl. ¶¶ 1-18 & Exs. A-H).[5]

On January 15, 2025, Plaintiff filed a memorandum of law in opposition to the motion to dismiss.  (Dkt. No. 26 ("Opp." or "Opposition")).  Plaintiff's opposition papers included a declaration from Plaintiff, setting forth certain statements allegedly made by Loeb (Dkt. No. 26-1 ("Golden Decl.")), and a copy of the Grand

---

[4] The DA Defendants state that because Golden's municipal liability and vicarious liability claims appear to be directed solely against the City, they will not address those claims.  (DA Br. at 2 n.2).  Yet the DA Defendants proceed to argue that to the extent Plaintiff's *Monell* claim challenges the policies and practices of DANY, it is without merit, and to request that the Court dismiss the *Monell* claim "either upon the motion of Defendant City or sua sponte."  (*Id.*).  Because the DA Defendants make this request only in a footnote and the issue has not been briefed, the Court declines to address the sufficiency of Plaintiff's *Monell* claim *sua sponte.*

[5] Of these materials, the Court considers only the Indictment and the Press Release, which are fairly deemed to be incorporated in the Complaint.  (*See* Compl. ¶¶ 38-39, 48-49).  The Court does not, however, rely on these documents for the truth of the matters set forth therein.  The remainder of the materials are not incorporated by reference in the Complaint and hence have not been considered on this motion.

6

Jury Minutes from the criminal case (Dkt. No. 26-2).  The DA Defendants filed a reply memorandum of law in support of their motion to dismiss on January 29, 2025.  (Dkt. No. 27 ("Rep" or "Reply")).[6]

## LEGAL STANDARDS

### A.  Motion to Dismiss Under Rule 12(b)(1)

"A Rule 12(b)(1) motion challenging subject matter jurisdiction may be based solely on the complaint or may rely on evidence beyond the pleadings."  *Thorne v. Cap. Music Gear LLC*, No. 23 Civ. 776 (LGS), 2024 WL 1604273, at *2 (S.D.N.Y. Apr. 12, 2024) (citing *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 441 (2d Cir. 2022)).  "'In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction.'"  *Id.* (quoting *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016)).  "However, the Court 'need not credit a legal conclusion couched as a factual allegation or a naked assertion devoid of further factual enhancement.'"  *Feliz v. IHealth Labs Inc.*, No. 23 Civ. 354 (JLR), 2024 WL 342701, at *2 (S.D.N.Y. Jan. 30, 2024) (quoting *Calcano v. Swavorski N. Am. Ltd.*, 36 F.4th 68, 75 (2d Cir. 2022) (additional citation omitted)).  Further, where "jurisdictional facts are placed in dispute" a reviewing court must "decide issues of fact by reference to evidence outside the pleadings, such as affidavits."  *Harty*, 28 F.4th at 441 (citation omitted).  "'A plaintiff asserting subject

---

[6] On September 4, 2024, the Honorable Lewis A. Kaplan referred this case to the undersigned for general pretrial supervision and dispositive motions requiring a report and recommendation.  (Dkt. No. 14).

matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.'" *Thorne*, 2024 WL 1604273, at *2 (quoting *Fountain*, 838 F.3d at 143).

## B. Motion to Dismiss Under Rule 12(b)(6)

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 566 U.S. at 678. The factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 (complaint must raise "more than a sheer possibility that a defendant has acted unlawfully").

In considering a motion to dismiss under Rule 12(b)(6), the Court must "accept[ ] all factual allegations in the complaint as true" and "draw[ ] all reasonable inferences in the plaintiff's favor." *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (citation omitted). Courts need not, however, consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (citation omitted); *see also Iqbal*,

556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Determining whether a plausible claim has been pled is "a context-specific task" that requires the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 113 (2d Cir. 2023). However, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Twombly*, 550 U.S. at 556 (citation omitted). "[T]he court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side[.]" *Lynch v. City of N.Y.*, 952 F.3d 67, 75 (2d Cir. 2020).

## DISCUSSION

The Supreme Court has "'stressed the importance of resolving immunity questions at the earliest possible stage in the litigation.'" *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). In addition, a defense of sovereign immunity under the Eleventh Amendment is generally understood to "implicate the Court's subject matter jurisdiction," *Ugo-Alum v. N.Y. State DMV*, No. 23 Civ. 7458 (JPC), 2024 WL 3553168, at *7 (S.D.N.Y. July 26, 2024)—although, as noted below, whether sovereign immunity is a jurisdictional defense remains an open question. Thus, on a motion to dismiss, courts typically consider issues of Eleventh Amendment sovereign immunity and prosecutorial immunity before assessing whether the complaint states a claim for relief. *See, e.g.*, *Rich v. N.Y.*, No. 21 Civ. 2835 (AT), 2022 WL 992885, at *3

(S.D.N.Y. Mar. 31, 2022) ("A district court must consider a challenge to subject matter jurisdiction before addressing other grounds for dismissal."); *Buari v. City of N.Y.*, 530 F. Supp. 3d 356, 378 (S.D.N.Y. 2021) ("[I]t is appropriate to address the issue of absolute immunity before assessing whether the plaintiff has sufficiently alleged constitutional violations.").

Following those precepts here, the Court first addresses the DA Defendants' argument that Eleventh Amendment sovereign immunity bars Golden's claims against them in their official capacities, and then addresses the DA Defendants' argument that absolute prosecutorial immunity under federal law and state-law immunities bar the claims against them in their individual capacities.

## A. Plaintiff's Official Capacity Claims

As an initial matter, although the DA Defendants predicate their motion to dismiss solely on Rule 12(b)(6) (Dkt. No. 25; DA Br. at 3), the weight of authority in this Circuit finds that "'[a] motion to dismiss for sovereign immunity under the Eleventh Amendment is properly brought pursuant to Rule 12(b)(1).'" *Jeannot v. N.Y. State*, 762 F. Supp. 3d 217, 233 (E.D.N.Y. 2015) (quoting *Long Island Pure Water Ltd. v. Cuomo*, 375 F. Supp. 3d 209, 215 (E.D.N.Y. 2019)); *see also, e.g.*, *Williams v. Does*, 24 Civ. 4794 (PAE) (SLC), 2025 WL 713295, at *3-5 (S.D.N.Y. Jan. 30, 2025) (finding claims barred by Eleventh Amendment sovereign immunity subject to dismissal under Rule 12(b)(1)), *R&R adopted*, 2025 WL 712889 (S.D.N.Y. Mar. 5, 2025); *Rashid v. O'Neill-Levy*, No. 23 Civ. 2670 (JPC) (SN), 2023 WL 9955699, at *2 (S.D.N.Y. Nov. 30, 2023) ("Dismissal based on sovereign immunity is

evaluated under Rule 12(b)(1).")., *R&R adopted*, 2024 WL 687289 (S.D.N.Y. Feb. 20, 2024).  Although this issue remains unsettled,[7] the Court assumes that Rule 12(b)(1) applies.  Ultimately the choice between Rule 12(b)(1) and Rule 12(b)(6) is not outcome-determinative as to the DA Defendants' sovereign immunity argument.

### 1. Sovereign Immunity for Local Prosecutors

"[S]tate governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogate[d] the states' Eleventh Amendment immunity[]."  *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (internal quotation marks and citation omitted, alteration in original).  "[T]he immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state."  *Id.* (cleaned up).  Courts treat suits against individual defendants sued in their official capacity as suits against the "'entity of which an officer is an agent.'"  *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978)).

This immunity may extend to District Attorneys ("DAs") and Assistant District Attorneys ("ADAs").  "Prosecutors are entitled to Eleventh Amendment immunity when they are acting as state officials rather than city or county employees.  When prosecuting a criminal matter on behalf of the state—for

---

[7] Whether a claim of Eleventh Amendment sovereign immunity constitutes a true issue of subject matter jurisdiction (analyzed under Rule 12(b)(1) on a motion to dismiss) or is more appropriately viewed as an affirmative defense (analyzed under Rule 12(b)(6)) remains "an open question in the Supreme Court and the Second Circuit."  *Carver v. Nassau Cnty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013); *see Canfield v. N.Y.*, No. 24 Civ. 1357 (GTS/TWD), 2025 WL 1288747, at *2 & n.5 (N.D.N.Y. May 5, 2025).'

example, in 'making an individual decision whether to prosecute'—a district attorney is considered a state official for Eleventh Amendment purposes." *Blessinger v. City of New York*, No. 17 Civ. 108, 2017 WL 3841873, at *2 (S.D.N.Y. Sept. 1, 2017), *aff'd sub nom. Byrne v. City of New York*, 736 F. App'x 263 (2d Cir. 2018) (quoting *Peterson v. Tomaselli,* 469 F. Supp. 2d 146, 157 (S.D.N.Y. 2007)). "Thus, if a district attorney or an assistant district attorney acts as a prosecutor, she is an agent of the State, and therefore immune from suit in her official capacity." *D'Alessandro v. City of New York*, 713 F. App'x 1, 8 (2d Cir. 2017); *see also Ying Jing Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir. 1993) ("'When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county.'") (quoting *Baez v. Hennessy*, 853 F2d 73, 77 (2d Cir. 1988)); *Ortiz v. City of N.Y.*, No. 04 Civ. 1285 (JSR) (RLE), 2005 WL 1837958, at *3 (S.D.N.Y. Aug. 3, 2005) ("Because the District Attorney's Office is acting as an official of the State of New York when it enforces the penal law, it is entitled to absolute immunity from suit" under the Eleventh Amendment).

## 2. Application

Here, the Complaint alleges that the DA Defendants charged Golden with a crime he did not commit in the absence of sufficient evidence to substantiate the charge; ignored the requirements of Penal Law § 195.00(2) in making their charging decision; allowed perjurious testimony to be presented before the Grand Jury; improperly assumed Golden's guilt based on his decision to not talk during the

investigation; and maliciously prosecuted Golden to seek headlines rather than obtain justice. (*See, e.g.*, Compl. ¶¶ 38-46). Deplorable as these alleged acts may be, they nonetheless were taken in the DA Defendants' role as prosecutors, triggering Eleventh Amendment sovereign immunity. *See, e.g.*, *Bristol v. Queens Cnty.*, No. 09 Civ. 5544 (JFB) (AKT), 2018 WL 5077166, at *29 (E.D.N.Y. Mar. 30, 2018) (where plaintiff's allegations against ADAs "stem from their official duties as prosecutors," the "claims against these defendants in their official capacity are barred by the Eleventh Amendment"); *Blessinger*, 2017 WL 3841873, at *2 (conduct that "is part and parcel of a district attorney's role in prosecuting" a crime on behalf of the state "cannot form the basis for liability against the DA Defendants in their official capacities").

Plaintiff's Opposition does not seriously contend otherwise. Instead, Plaintiff relies on *Myers v. Cnty. of Orange*, 157 F.3d 66 (2d Cir. 1998), for the proposition that "'[u]nder New York law, DAs and ADAs are generally presumed to be local county officers, not state officers.'" (Opp. at 5 (quoting *Myers*, 157 F.3d at 76)). While acknowledging that there is an exception to this rule when DAs and ADAs are deciding whether to prosecute—in which event Eleventh Amendment sovereign immunity attaches—Golden argues that this exception does not encompass the DA Defendants' issuance of "a false and untrue statement that Golden stole property." (*Id.* at 6). Because the statements in the Press Release were effectively made outside the "judicial context and are unrelated to the decision to prosecute or advocate in the case," Golden contends, the DA Defendants were not acting in their

13

prosecutorial capacity when issuing the Press Release and they are not entitled to immunity under the Eleventh Amendment.  (*Id*. at 7).

Golden's reading of Second Circuit law is questionable.  The Second Circuit has held, as Golden notes, that a district attorney will not be deemed to be acting as a state official with respect to claims centered on "the administration of the district attorney's office," as where "the district attorney acts as 'manager' of the district attorney's office of one of New York's constituent counties."  *Ying Jing Gan*, 996 F.2d at 536 (citing *Walker v. City of N.Y.*, 974 F.2d 293, 301 (2d Cir. 1992)).  But that is because, in those instances, the district attorney "may be considered a municipal policymaker for the City of New York."  *Id*.; *see also Walker*, 974 F.2d at 301 ("Where a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker.").  That was true in *Myers*¸ where Orange County was held liable on a *Monell* theory based on a policy of the county district attorney that directed police officers and ADAs to engage in investigative procedures that violated individuals' constitutional rights.  *Myers*, 157 F.3d at 76-77.  But Golden does not challenge any policy of DANY relating to press releases or allege that the Press Release was the result of an impermissible policy.  A press release announcing charges brought under state Penal Law at least arguably fits within the scope of Eleventh Amendment immunity.  *See, e.g.*, *Swinton v. City of N.Y.*, 785 F. Supp. 2d 3, 9-10 (E.D.N.Y. 2011) (finding that all claims against DA in his official capacity, which included claims for allegedly defamatory statements to press about plaintiffs, were shielded by Eleventh Amendment immunity).

The Court need not, however, decide whether the DA Defendants are entitled to sovereign immunity for Golden's claims relating to the Press Release. Even if the DA Defendants were acting as county rather than state officials in issuing the Press Release, Golden's official capacity claims against the DA Defendants arising from the Press Release would have to be dismissed because they are duplicative of Golden's *Monell* and vicarious liability claims against the City. "In an official capacity suit, the real party in interest is the governmental entity and not the named official." *Tanvir v. Tanzin*, 894 F.3d 449, 459 (2d Cir. 2018) (cleaned up). "Hence, '[w]ithin the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant.'" *Kalamaras v. Cnty. of Nassau*, No. 17 Civ. 1068 (SFJ) (ARL), 2019 WL 4452281, at *15 (E.D.N.Y. Sept. 16, 2019) (quoting *Phillips v. Cnty. of Orange*, 894 F. Supp. 2d 345, 385 (S.D.N.Y. 2012)); *see also Lee v. Cnty. of Onondaga*, No. 13 Civ. 1285 (BKS) (TWD), 2016 WL 9441472, at *9 (N.D.N.Y. Aug. 19, 2016) ("[S]ince Plaintiff alleges municipal liability and vicarious liability claims against [the county], his federal and state law claims against [the individual officers] in their official capacities must be dismissed as duplicative.").

On this basis, courts have dismissed official capacity claims against local prosecutors as redundant where, as here, the plaintiff has sued the municipal entity as well. *See, e.g.*, *Golston v. Cortese*, No. 21 Civ. 914 (CTS/CFH), 2022 WL 2657290, at *5 (N.D.N.Y. Apr. 1, 2022) (claims against defendant in his official capacity as

county prosecutor should be dismissed because "claims against municipal officers in their official capacities are really claims against the municipality and, thus, are redundant when the municipality is also named as a defendant") (citation omitted); *Greene v. City of N.Y.*, No. 08 Civ. 245 (AMD) (CLP), 2017 WL 1030707, at *29 (E.D.N.Y. Mar. 15, 2017) ("Because any claims against DA Hynes for his role as a 'policymaker' for the KCDA would be duplicative of the plaintiff's claims against the City of New York under *Monell*, those claims are dismissed."); *McCray v. City of N.Y.*, No. 03 Civ. 9685 (DAB), 2007 WL 4352748, at *26 n.29 (S.D.N.Y. Dec. 11, 2007) ("[T]he Court agrees with DA Defendants that [an official capacity action against DA Morgenthau] would be unnecessarily duplicative of Plaintiff's *Monell* action against the institutional entity of the City of New York."); *Peterson*, 469 F. Supp. 2d at 158 (holding that, although ADA's actions were taken as a county official as opposed to a state officer, plaintiff's claims against ADA "in his official capacity . . . are properly analyzed as if the claims were brought against the City of New York itself").

Accordingly, the Court recommends that Golden's claims against the DA Defendants in their official capacities be dismissed.

## B. Absolute Prosecutorial Immunity

Unlike sovereign immunity, prosecutorial immunity is not a jurisdictional ground for dismissal. *See Lee v. Finn*, No. 22 Civ. 1152 (BKS/CFH), 2023 WL 6796425, at *4 n.5 (N.D.N.Y. Oct. 13, 2023) ("[P]rosecutorial immunity, as with other absolute immunities, is an affirmative defense rather than a question of

jurisdiction."); *Tigano v. United States*, 527 F. Supp. 3d 232, 243 n.4 (E.D.N.Y. 2021) (prosecutorial immunity is not "a jurisdictional ground for dismissal under Rule 12(b)(1)," but "a common law immunity available upon a Rule 12(b)(6) motion"). "Absolute immunity 'is an affirmative defense whose availability depends on the nature of the function being performed by the defendant' who is claiming it." *Sharp v. Morgenthau*, No. 08 Civ. 5919 (PKC) (FM), 2010 WL 339767, at *2 (S.D.N.Y. 2010) (quoting *Shmueli v. City of N.Y.*, 424 F.3d 231, 236 (2d Cir. 2005)). "If the nature of the defendant's function is clear from the face of the complaint and any other materials that may be considered on a Rule 12(b)(6) motion, a court may resolve the defendant's claim as a matter of law." *Id.* When a defendant asserts a prosecutorial immunity defense at the pleading stage, "'the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense.'" *Buari*, 530 F. Supp. 3d at 378 (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)).

### 1. Scope of Immunity

In determining whether particular actions of government officials, including prosecutors, "fit within a common-law tradition of absolute immunity, or only the more general standard of qualified immunity," the Supreme Court has adopted "a functional approach, which looks to the nature of the function performed, not the identity of the actor who performed it[.]" *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (citation omitted). Under this approach, prosecutors are absolutely immune from a civil suit for damages under Section 1983 "in initiating a prosecution and in

presenting the State's case[.]" *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976). Absolute immunity also extends to prosecutors' acts "in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of [their] role as . . . advocate[s] for the State." *Buckley*, 509 U.S. at 273. The protected functions which are preliminary to the initiation of proceedings include deciding "whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present." *Imbler,* 424 U.S. at 431 n.33. However, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley*, 509 U.S. at 273.

Prosecutorial immunity "is broadly defined, covering 'virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate.'" *Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) (quoting *Hill v. City of N.Y.*, 45 F.3d 653, 660 (2d Cir. 1995)) (alteration in original). But it is not unbounded. "A narrow limitation to the scope of absolute immunity . . . exists . . . where the prosecutor acted well outside the scope of authority, rather than where the defect relates . . . to the prosecutor's motivation or the reasonableness of his official action." *Anilao v. Spota*, 27 F.4th 855, 864 (2d Cir. 2022). "The jurisdictional defect must be clear and obvious," *id.*, and it is only where the prosecutor "acts without any colorable claim of authority" that absolute immunity is

lost, *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) (citation

omitted); *see also Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987) (prosecutors

have absolute immunity even if it turns out that "state law did not empower [them]

to bring the charges," so long as "they have at least a semblance of jurisdiction").

In *Shmueli*, the plaintiff alleged that two New York County ADAs

maliciously prosecuted her for aggravated harassment "despite knowing that the

charges against her were false and that [she] was innocent" of those charges.  424

F.3d at 238.  The plaintiff in *Shmueli* also alleged that the prosecutors made several

threatening phone calls to her home during the prosecution.  *Id.* at 234.  The district

court rejected the prosecutors' defense of absolute immunity because they acted

"without clear jurisdiction and without any colorable claim of authority."  *Id.* at 235.

The Second Circuit reversed, holding that the district court had improperly

"equat[ed] an allegedly improper prosecutorial state of mind with a lack of

prosecutorial jurisdiction."  *Id.*  Absolute immunity, the Second Circuit explained,

shielded the prosecutors' conduct because the indictment contained allegations that,

even if completely false, could authorize the prosecutors to prosecute the plaintiff

under the relevant New York penal laws.  *Id.* at 238–39.

### 2. Application

It is clear as a matter of law that absolute prosecutorial immunity shields the

DA Defendants from the bulk of Golden's allegations.  Golden's core claim is that

the DA Defendants violated his rights by charging him with a crime he did not

commit and that there was no evidence to support this charge.  (Compl. ¶¶ 37-42,

73, 81, 86, 115-16, 126-27, 130-31, 138-40).  But a prosecutor "has absolute immunity from a claim for damages for 'initiating a prosecution.'"  *Kent v. Cardone*, 404 F. App'x 540, 542 (2d Cir. 2011) (quoting *Imbler*, 424 U.S. at 431).  Although Golden alleges that the DA Defendants "ignored" the "language, substance, and intent of the statute" under which he was charged (Penal Law § 195.00(2)) (Compl. ¶ 43), he does not contend, or allege any facts to suggest, that the prosecutors acted "without any colorable claim of authority," *Shmueli*, 424 F.3d at 237, or "at least a semblance of jurisdiction," *Barr*, 810 F.2d at 361.  Likewise deficient is Golden's allegation that the DA Defendants "allowed" a witness to "commit perjury" before the Grand Jury (Compl. ¶ 44).  *See Zanfardino v. City of N.Y.*, 230 F. Supp. 3d 325, 333 (S.D.N.Y. 2017) (malicious prosecution claim based on ADA's alleged subornation of perjury before the grand jury was "clearly foreclosed" by absolute prosecutorial immunity).

Plaintiff makes extensive (albeit largely conclusory) allegations about the DA Defendants' purported improper motives in initiating the prosecution against him, including that they "intentionally" charged him despite knowing he was innocent, did so in order to "[seek] headlines" and "to advance their public image," and were "motivated solely by a desire to harm Plaintiff."  (Compl. ¶¶ 45-46, 73, 81, 116, 127, 129, 132, 133, 159).  Even if taken as true and construed in the manner most favorable to Plaintiff, these allegations do not enable Plaintiff to overcome the "formidable obstacle," *Anilao,* 27 F.4th at 865, of absolute prosecutorial immunity. *See Shmueli*, 424 F.3d at 237 ("Once the court determines that the challenged

prosecution was not clearly beyond the prosecutor's jurisdiction, the prosecutor is shielded from liability for damages for commencing and pursuing the prosecution, regardless of any allegations that [the prosecutor's] actions were undertaken with an improper state of mind or improper motive."). Even Golden's more specific allegation that ADA Loeb, when dismissing the charge against him, "admitted that [he] should never have been indicted" (Compl. ¶ 62; *see* Golden Decl. ¶ 3(i)) is insufficient. *See id.* at 238 (even allegation that prosecutor "kn[e]w[] that the charges against [plaintiff] were false" insufficient to overcome immunity"); *Winn v. Louisiana*, Civil Action No. 04-1563-p, 2007 WL 496625, at *2 (W.D. La. Jan. 17, 2007) (absolute immunity barred claims against DA and two ADAs despite plaintiff's allegation that one of the ADAs "admitted at trial that the State did not have any evidence against him").

As with his response to the DA Defendants' sovereign immunity argument, Golden's Opposition does not dispute that the DA Defendants are entitled to absolute prosecutorial immunity for these acts. Here again, he focuses solely on the DA Defendants' allegedly "false and misleading Press Release," which he contends lies "at the center of the allegations" in this case. (Opp. at 7-8). Golden argues that under Supreme Court precedent, "'absolute immunity does not apply . . . when the prosecutor makes statements to the press.'" (Opp. at 7 (quoting *Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009)).

In this, Golden is correct. Even prior to *Van de Kamp*, the Supreme Court held in *Buckley*: "Statements to the press may be an integral part of a prosecutor's

job . . . and they may serve a vital public function.  But in these respects a prosecutor is in no different position than other executive officials who deal with the press, and . . . qualified immunity is the norm for them." *Buckley*, 509 U.S. at 278. Accordingly, a prosecutor's statements to the press, including in a press release, are entitled only to qualified, not absolute, immunity. *See Flagler v. Trainor*, 663 F.3d 543, 549 (2d Cir. 2011) (finding that "absolute immunity does not shield statements made to the press" by ADA); *Swinton*, 785 F. Supp. 2d at 10 ("DA Brown is entitled only to qualified immunity with respect to plaintiffs' § 1983 claim based on" allegedly defamatory statements at press conference); *Bertuglia v. City of N.Y.*, 839 F. Supp. 2d 703, 733 (S.D.N.Y. 2012) (finding that defendant ADAs "[p]lainly" did not have "absolute immunity for the press release that they allegedly issued" and instead were "entitled to qualified immunity" only); *Ianuale v. New Jersey*, Civil Action No. 18-3069 (GC) (JBD), 2024 WL 4856206, at *12 (D.N.J. Nov. 20, 2024) (rejecting prosecutors' argument that "they should be protected by absolute immunity for the press releases about Plaintiffs' charges" and finding that only qualified immunity applied).

The DA Defendants do not dispute that under federal law, the Press Release constitutes an act outside their role as advocates and does not trigger absolute prosecutorial immunity.  Therefore, the Court finds that all of the conduct attributed to the DA Defendants in the Complaint is shielded by absolute prosecutorial immunity, with the exception of the Press Release.[8]  The Court now

---

[8] To the extent Golden alleges that the DA Defendants acted improperly during the investigation, these allegations are conclusory in nature, failing to specify any particular conduct by the DA

turns to whether, as the DA Defendants contend, there are other reasons why the Press Release is not a proper basis upon which Golden may proceed with his individual capacity claims against them.

## C. Liability for Press Release

In addressing the DA Defendants' potential liability for the Press Release, it is necessary to distinguish between Plaintiff's claims under federal law and his claims under state common law. *See Cornejo v. Bell*, 592 F.3d 121, 130 (2d Cir. 2009) (noting that "[t]he issue of immunity . . . differs as between the state and federal law claims," and applying federal law of immunity to plaintiff's § 1983 claims and New York law of immunity to plaintiff's state law claims).

### 1. Federal Claims

As the DA Defendants point out in their Reply, Golden's reliance on the Press Release to circumvent the shield of absolute prosecutorial immunity suffers from a fatal flaw: "[t]he only constitutional violations alleged by [P]laintiff are[] '[t]he right to be free from arrest or prosecution in the absence of probable cause.'" (Rep. at 2-3 (quoting Opp. at 12)). In other words, Golden's two Section 1983 claims are for false

---

Defendants. (*See* Compl. ¶ 129 (alleging that all Defendants (including Lieutenant Tanner) caused to be filed a false criminal charge against Plaintiff "without any investigation and/or rudimentary query"); ¶¶ 139-41 (alleging that all the individual Defendants (including Tanner) had "a duty to conduct proper investigations" (among other duties) and "failed" to discharge such duties)). Golden does not argue that he has sufficiently alleged that the DA Defendants performed "investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution" and that give rise only to qualified immunity. *See Buckley*, 509 U.S. at 273. Nor does the Court perceive any basis for such an argument. *See, e.g., Giraldo*, 694 F.3d at 166 (explaining that "investigative acts reasonably related to decisions whether or not to begin or to carry out a particular criminal prosecution . . . are shielded by absolute immunity when done by prosecutors"); *Belot v. Wieshaupt*, No. 96 Civ. 3005 (SS), 1997 WL 218449, at *7 (S.D.N.Y. Apr. 29, 1997) (Sotomayor, J.) ("[I]t is not enough for plaintiff to allege simply that [the defendant ADAs] 'performed investigative functions' or that they were 'involved' in the criminal investigation, plaintiff must also identify wrongdoing by defendants in their investigative capacity.").

arrest (Compl. ¶¶ 68-78) and malicious prosecution (*id*. ¶¶ 79-92), both of which are derived from the Fourth Amendment right to be free from unreasonable seizures. *See Chase v. Nodine's Smokehouse, Inc.*, 360 F. Supp. 3d 98, 111 (D. Conn. 2019). He does *not* assert that the issuance of the Press Release, itself, violated his constitutional rights, perhaps in recognition of the well-settled rule that defamation "is an issue of state law, not of federal constitutional law, and therefore provides an insufficient basis to maintain a § 1983 action." *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004); *see Siegert v. Gilley*, 500 U.S. 226, 234 (1991) ("damage [that] flows from injury caused by the defendant to a plaintiff's reputation . . . is not recoverable" in a Section 1983 action).[9]

To be sure, both of Golden's Section 1983 causes of action incorporate by reference all of his factual allegations, including those relating to the Press Release (Compl. ¶¶ 68, 79), and his Section 1983 claim for malicious prosecution references the fact that the Press Release remains on the DANY website (*id*. ¶ 85). Read charitably, these allegations suggest that Golden's Section 1983 claims may rely on the Press Release as *evidence* of the DANY Defendants' purportedly improper intent and the damage caused to Golden's reputation. (*See* Compl. ¶ 56 (explaining that the DA Defendants' "intent in issuing the above-mentioned press release was to

---

[9] Under "limited circumstances," relief under Section 1983 is available for defamation committed by government officials. *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010). A claim for such relief, rooted in the Fourteenth Amendment's Due Process Clause, is known as a "stigma-plus" claim. *Id*. "To establish a 'stigma-plus' claim, a plaintiff must show (1) 'the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false,' and (2) 'a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.'" *Id*. (quoting *Sadallah*, 383 F.3d at 38). The "state-imposed alteration of status or burden" must be "in addition to the stigmatizing statement." *Id*. (citation omitted). Golden does not assert a "stigma-plus" claim here.

harm Golden both socially and economically")).  But this does not mean that Golden's Section 1983 claims for false arrest and malicious prosecution are *based* on the Press Release.  They are instead, as they must be, based on his arrest and prosecution allegedly without probable cause in violation of his Fourth Amendment rights.  (*Id.* ¶¶ 69, 73, 80-81).  *See Harris v. N.Y. Div. of Parole*, No. 18 Civ. 1435 (LEK) (TWD), 2019 WL 1958017, at *2 (N.D.N.Y. May 1, 2019) ("[B]oth false arrest and malicious prosecution require a showing that there was no probable cause for the arrest or prosecution.").  The Press Release does not go to the question of probable cause one way or the other; nor can it be said that the Press Release effected an unreasonable "seizure" of Plaintiff.

To the extent that Golden points to the Press Release as evidence of the DA Defendants' improper intent or motivation in effecting his arrest and prosecution, this cannot deprive the DA Defendants of the absolute prosecutorial immunity to which they are otherwise entitled with respect to the Section 1983 claims.  As the DA Defendants aptly note, absolute immunity still attaches because such immunity is "'not affected by allegations that improperly motivated prosecutions were commenced or continued.'"  (Rep. at 3 (quoting *Shmueli*, 424 F.3d at 237-38)).  Thus, because the allegedly defamatory Press Release forms no basis for Golden's Section 1983 claims, the fact that the Press Release warrants only qualified immunity is immaterial to the application of absolute prosecutorial immunity to those claims.

Finally, even if it could be said that Golden's Section 1983 claims hinged in some way on the Press Release, the DA Defendants still would be entitled to

qualified immunity. "'The doctrine of qualified immunity protects government officials from liability for civil damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *McGowan v. United States*, 825 F.3d 118, 124 (2d Cir. 2016) (quoting *Wood v. Moss*, 572 U.S. 744, 757 (2014)). "For a right to be 'clearly established,' the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Here, it cannot be said that there is a "clearly established" right under federal constitutional law to be free from defamatory statements by government officials. To the contrary, as noted above, it has long been recognized that defamation is a matter of state law. Thus, Golden has not sufficiently alleged that, in issuing the Press Release, the DA Defendants violated a "clearly established" statutory or constitutional right. Consequently, the DA Defendants would be entitled to the defense of qualified immunity as a matter of law. *See Ianuale*, 2024 WL 4856206, at *12 (finding that defendant prosecutors "are entitled to qualified immunity because Plaintiffs have not alleged that the act of issuing the press releases violate[d] a clearly established right").

### 2. State Law Claims

Golden's state common law claims against the DA Defendants are subject to a different analysis. Although Golden does not sue for defamation, he does assert common law claims for abuse of process and gross negligence which, at least

arguably, may properly rest in part on the allegedly defamatory statements in the Press Release.  (*See* Compl. ¶¶ 128-29 (alleging that the DA Defendants "abused the criminal process" through, *inter alia*, their false criminal charges and "public statements" against Plaintiff); *id.* ¶¶ 138, 141 (alleging that DA Defendants are liable for gross negligence because of, *inter alia*, violations of their duty to prevent and cease the false arrest, malicious prosecution, and "other wrongful acts" committed against Plaintiff)).[10]  Appearing to acknowledge this possibility, the DA Defendants argue that, to the extent any of Golden's common law claims rely on the Press Release, these claims fail on the basis of two grounds for immunity (or privilege) available under New York state law.  (DA Br. at 6-8).

First, the DA Defendants argue that under New York law, "absolute immunity extends to the DA and to the attorneys who handled the case for which a press release was issued."  (DA Br. at 6-7).  Golden does not respond to this argument.  The Court agrees that it is well-founded.

New York law recognizes that some communications, even if they are defamatory, are protected by an absolute privilege for public policy reasons. "Absolute privilege protects communications made by 'individuals participating in a public function, such as judicial, legislative, or executive proceedings' in order to

---

[10] Moreover, the federal qualified immunity doctrine only "protects an official from liability under *federal* causes of action but is not generally understood to protect officials from claims based on state law." *Jenkins v. City of N.Y.*, 478 F.3d 76, 86 (2d Cir. 2007) (emphasis in original).  Although New York common law provides government officials with comparable immunity from state law claims, this doctrine does not apply where "'the officials' actions are undertaken in bad faith or without a reasonable basis.'" *Gardner v. Robinson*, No. 16 Civ. 1548 (GBD) (RWL), 2018 WL 722858, at *3 n.7 (S.D.N.Y. Feb. 6, 2018) (quoting *Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006)).  The DA Defendants do not invoke the New York doctrine of qualified immunity in their motion to dismiss.

'ensure that their own personal interests—especially fear of a civil action, whether successful or otherwise—do not have an adverse impact upon the discharge of their public function.'" *Riggio v. Cnty. of Nassau*, 218 A.D.3d 502, 503, 193 N.Y.S.3d 84, 87 (2d Dep't 2023) (quoting *Stega v. N.Y. Downtown Hosp.*, 31 N.Y.3d 661, 669, 82 N.Y.S.3d 323, 107 N.E.3d 543 (2018)). "Accordingly, '[a]bsolute privilege is based upon the personal position or status of the speaker and is limited to the speaker's official participation in the processes of government.'" *Id.* (quoting *Gugliotta v. Wilson*, 168 A.D.3d 817, 818, 93 N.Y.S.3d 309 (2d Dep't 2019)). "'[O]ne who enjoys the absolute privilege . . . may not be sued no matter how malicious his state of mind.'" *Brantley v. Mun. Cred. Union*, No. 19 Civ. 10994 (KPF), 2021 WL 981334, at *10 (S.D.N.Y. Mar. 16, 2021) (quoting *Boice v. Unisys Corp.*, 50 F.3d 1145, 1149 (2d Cir. 1995)).

The absolute privilege extends to "an official who is 'a principal executive of State or local government or is entrusted by law with administrative or executive policy-making responsibilities of considerable dimension,' and is 'limited to the speaker's official participation in the processes of government[.]" *Id.* (first quoting *Stukuls v. State*, 42 N.Y.2d 272, 278, 397 N.Y.S.2d 740, 366 N.E.2d 829 (1977), and then quoting *Park Knoll Assocs. v. Schmidt*, 59 N.Y.2d 205, 209, 454 N.Y.S.2d 901, 451 N.E.2d 182 (1983)). Here, there is no question that DA Bragg, in whose name the Press Release was issued, is a principal executive of local government and is entrusted by law with considerable administrative and executive policy-making responsibilities. Nor is there any doubt the Press Release was issued in the course

28

of his official duties and as part of his participation in the process of government. Hence, DA Bragg is protected by absolute privilege for the Press Release. *See, e.g.*, *Brantley*, 2021 WL 981334, at *10 (finding that absolute privilege barred defamation claim against New York's Superintendent of Department of Financial Services based on statements in press release); *Friedman v. Rice*, 47 Misc. 3d 944, 952, 5 N.Y.S.3d 816 (Sup. Ct. Nassau Cnty. 2015) (finding that absolute privilege barred defamation claim against Nassau County District Attorney based on statements in press release).

As for ADAs Viorst and Loeb, the Complaint makes no specific allegations that they played any role in preparing or issuing the press release. (*See* Compl. ¶¶ 48-56; *see also* Opp. at 1-2 (arguing only that Bragg was "directly involved" in the Press Release)). In any event, New York courts have extended the absolute privilege to lower-level employees who communicate information to the press. *See Friedman*, 47 Misc. 3d at 952 ("As [the District Attorney] is protected by absolute immunity for her conduct in producing the report, [the DA's information officers] should be similarly protected for making statements [to the press] based upon the report."); *Gautsche v. State of N.Y.,* 67 A.D.2d 167, 170, 415 N.Y.S.2d 280 (3d Dept. 1979) (absolute immunity accorded to Attorney General extended to press release issued by Assistant Attorney General).

Second, the DA Defendants argue that they are afforded immunity under New York Civil Rights Law § 74, which provides, in pertinent part, that "[a] civil action cannot be maintained . . . for the publication of a fair and true report of any

judicial proceeding, legislative proceeding, or other official proceeding[.]" (DA Br. at

7-8). "This 'privilege is absolute and is not defeated by allegations of malice or bad

faith.'" *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021) (quoting *Fuji*

*Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 411 (S.D.N.Y. 2009));

*accord Pelayo v. Celle*, 270 A.D.2d 469, 705 N.Y.S.2d 282 (2d Dep't 2000).  It has

been held that the Section 74 privilege applies to a press release issued by a DA's

Office announcing an indictment.  *Salis v. City of New York*, 81 Misc. 3d 1209(A), at

*7, 199 N.Y.S.3d 924 (Sup. Ct. Kings Cnty. 2023) ("The DA's Office press release is

protected from litigation under Civil Rights Law § 74 as 'a fair and true report of a

judicial proceeding.'") (cleaned up); *see Greenberg v. Spitzer*, 155 A.D.3d 27, 51, 62

N.Y.S.3d 372 (1st Dep't 2017) (finding that former New York Attorney General's

statements about a complaint filed by his office against plaintiff were absolutely

privileged under Civil Rights Law § 74); *see also Carroll v. Trump*, 664 F. Supp. 3d

550, 557 (S.D.N.Y. 2023) (noting that statute was amended in 1940 to extend

coverage from newspapers to "any person, firm or corporation").

   "The case law has established a liberal interpretation of the 'fair and true

report' standard… so as to provide broad protection to news accounts of judicial or

other official proceedings."  *Becher v. Troy Publ. Co.,* 183 A.D.2d 230, 233, 589

N.Y.S.2d 644 (3d Dep't 1992).  "For a report to be characterized as 'fair and true'

within the meaning of the statute, thus immunizing its publisher from a civil suit

sounding in libel, it is enough that the substance of the article be substantially

accurate. . . .  [T]he language used therein should not be dissected and analyzed

with a lexicographer's precision." *Holy Spirit Assn. for Unification of World Christianity v. New York Times Co.,* 49 N.Y.2d 63, 67-68, 424 N.Y.S.2d 165, 399 N.E.2d 1185 (1979). "This is consistent with the common law of libel, which overlooks minor inaccuracies and concentrates upon substantial truth." *Cholowsky v. Civiletti*, 69 A.D.3d 110, 114, 887 N.Y.S.2d 592 (2d Dep't 2009) (cleaned up). *See also Kinsey*, 991 F.3d at 178-79 (echoing these principles).

The DA Defendants persuasively argue that, when read in full, the Press Release "clearly lays out the underlying facts of the matter, and explains that, while criminal defendants Gonzalez and Czech actually stole the champagne bottles, plaintiff was charged with Official Misconduct for failing to intervene[.]" (DA Br. at 7). A review of the Press Release substantiates this argument. The first paragraph of the Press Release specifically states that *Gonzalez and Czech* were each charged with Grand Larceny and Criminal Possession of Stolen Property, while reporting that *Golden* was charged only with Official Misconduct. (Guilmain Decl. Ex. D). The fourth paragraph goes on to describe how Gonzalez and Czech stole the champagne bottles, saying only of Golden that "[a]t no time as the crime unfolded did GOLDEN, who observed the conduct, take any action to intervene to prevent the theft or restore the stolen property to its owners." (*Id*.). Thus, although the Complaint alleges that the first sentence of the Press Release falsely states that Golden had a "role[] in the theft" (Compl. ¶¶ 49-51), a fair-minded reader of the full Press Release would understand that Golden's role was limited to that of an

"observe[r]" who failed "to intervene to prevent the theft," *not* that Golden was being accused of stealing the champagne bottles himself.

Plaintiff's Opposition ignores the text of the Press Release and instead focuses on the headline of the Press Release. (Opp. at 1, 6-7). According to Golden, the headline makes the "materially false statement" that *Golden* was indicted for "Stealing Champagne Bottles While Working at Electric Zoo Music Festival," and so the Press Release does not qualify as a "fair and true" report. (Opp. at 6-7). But the headline makes no such statement. It reads: "D.A. Bragg Announces Indictments of NYPD Detectives for Stealing Champagne Bottles While Working at Electric Zoo Music Festival." (Guilmain Decl. Ex. D). That statement was true: Two NYPD Detectives—Gonzalez and Czech—*were* indicted for stealing champagne bottles. And since the Press Release makes clear that Golden was *not* being charged with stealing the champagne, the headline, fairly read, cannot be viewed as an accusation that Golden committed theft.

In *Becher*, the court held that a newspaper publisher was afforded immunity under Civil Rights Law § 74 despite the plaintiff's claim that numerous articles and headlines "expressly or impliedly" reported that plaintiff had been indicted on felony bribery charges, when in fact he had only been charged with non-bribery misdemeanor offenses. *Becher*, 183 A.D.2d at 233. The court explained that, "[i]n each instance, the body of the article correctly stated that plaintiff was charged with conspiracy and making an apparently false sworn statement," while reporting that other defendants charged in the same indictment were accused of bribery offenses.

*Id.* at 236. "Thus, considering the headlines in the context of the articles that followed, as we must, and the predominant nature of the case as a whole, each headline under review constituted a fair and true headnote of the article published and was, therefore, entitled to absolute immunity under Civil Rights Law § 74." *Id.*

The same conclusion is compelled here. As in *Becher*, the body of the Press Release makes clear that Golden was not charged with theft and that it was his co-defendants who were charged with theft, thus mitigating the risk of potential misinterpretation of the headline (or the first line) in isolation. As such, the DA Defendants are also afforded immunity under Civil Rights Law § 74 for the issuance of the Press Release. *See Wexler v. Allegion (UK) Ltd.*, 374 F. Supp. 3d 302, 314 (S.D.N.Y. 2019) (granting defendant's 12(b)(6) motion to dismiss plaintiff's defamation claim based on a press release "because the Press Release is privileged under section 74"); *Kinsey v. New York Times Co.*, No. 18 Civ. 12345 (VSB), 2020 WL 1435141, at *8 (S.D.N.Y. Mar. 23, 2020) (granting a 12(b)(6) motion to dismiss plaintiff's defamation claim based on the publication of an article describing a declaration filed in a civil case because it "is a fair and accurate report protected under New York Civil Rights Law Section 74."), *aff'd*, 991 F.3d 171 (2d Cir. 2021).[11]

---

[11] The Court finds unavailing two other arguments made by the DA Defendants as to why Golden's state-law claims should be dismissed.

First, the DA Defendants argue that "the Court should decline to exercise supplemental or pendent jurisdiction under 28 U.S.C. § 1367(c)(3) as the claims conferring federal jurisdiction are ripe for dismissal." (DA Br. at 16). This argument is without merit because, even though the Court has determined above that Golden's federal claims against the DA Defendants are subject to dismissal, Golden's federal claims against the City and Tanner remain pending. Even where a district court has decided to dismiss all federal claims against particular defendants, "the Second Circuit has made clear that a district court may not decline to exercise jurisdiction over state law claims [against those particular defendants] where federal claims remain against other defendants and the state law claims 'form part of the same case or controversy.'" *Bryant v. Steele*, 93 F. Supp. 3d 80, 94 (E.D.N.Y.

* * *

In sum, the Complaint fails to plead any theory of liability against the DA Defendants in their individual capacities which attaches to conduct outside the scope of the immunities afforded under federal and New York law. Nor does the Complaint set forth any viable claim against the DA Defendants in their official capacities. All claims asserted against the DA Defendants should, therefore, be dismissed on these grounds. As such, it is unnecessary for the Court to address the DA Defendants' remaining arguments for dismissal, including whether the Complaint adequately pleads personal involvement or the elements of the causes of action asserted.

## D.  Leave to Amend

Plaintiff's Opposition requests that, should any of his claims be dismissed, the Court grant him leave to amend his Complaint as an alternative to dismissal with prejudice.  (Opp. at 11).  The DA Defendants argue, in both their Motion to Dismiss and their Reply, that because all the conduct alleged in the Complaint is

---

2015) *(*quoting *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 325 (2d Cir. 2002)).  That rule applies here, as jurisdiction-conferring federal claims remain against the City and Tanner and the state law claims against the DA Defendants arise from the same set of operative facts as those federal claims.

Second, the DA Defendants argue that Golden fails to allege that "'at least thirty days have elapsed since the service of [a notice of claim] ... and that adjustment or payment thereof has been neglected or refused.'"  (DA Br. at 16 n.7) (quoting N.Y. Gen. Mun. L. § 50-i(1)) (alteration in original).  The Court declines to address this argument as it is mentioned exclusively in a footnote in the DA Defendants' brief.  *See, e.g., Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 314 (S.D.N.Y.) ("[B]ecause the arguments appear only in footnotes, they are not properly raised, and the Court is under no obligation to consider them."), *aff'd*, 626 F. App'x 20 (2d Cir. 2015); *Gramercy Advisors, LLC v. Ripley,* No. 13 Civ. 9070 (VEC), 2014 WL 5847444, at *2 (S.D.N.Y. Nov. 12, 2014) ("[C]ourts generally do not consider an argument mentioned only in a footnote to be adequately raised.").

protected by Eleventh Amendment and absolute prosecutorial immunities, "any amendment to the Complaint would be futile." (Rep. at 7; *see* DA Br. at 8).

The Court has discretion to grant leave to amend where "justice so requires," Fed. R. Civ. P. 15(a)(2), and "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead," *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). "Without the benefit of a ruling [on a motion to dismiss], many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies." *Loreley Fin. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).

"However, leave to replead can be denied where it is clear that no amendments can cure the pleading deficiencies and any attempt to replead would be futile." *Harrison v. Cnty. of Nassau*, No. 15 Civ. 2712 (JFB) (AKT), 2016 WL 4083381, at *6 (E.D.N.Y. Aug. 1, 2016) (denying, *inter alia*, leave to amend complaint as against Nassau County District Attorney defendants on futility grounds because of defendants' entitlement to prosecutorial immunity); *see Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("The problem with [plaintiff's] cause[ ] of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.").

Here, because Golden has not yet amended his Complaint, and because the Court cannot conclude that any amendment would be futile, the Court recommends that, consistent with the usual practice, Golden should be given leave to replead his claims against the DA Defendants. "Defendants will have the opportunity to

challenge any deficiencies in Plaintiff's pleading by filing a motion to dismiss such pleading.  Thus, there is no practical difference between Defendants opposing Plaintiff's motion to amend and Defendants filing a motion to dismiss after Plaintiff files [his] Second Amended Complaint." *Cruz v. Loc. 32BJ*, 762 F. Supp. 3d 286, 289 (S.D.N.Y. 2025) (citation omitted).

## CONCLUSION

For the reasons stated above, the undersigned hereby recommends that the Honorable Lewis A. Kaplan grant the DA Defendants' motion to dismiss (Dkt. No 25) with leave to amend.

DATED:    New York, New York
          July 7, 2025

_____
GARY STEIN
United States Magistrate Judge

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. Section 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen days, inclusive of weekends and holidays, from the date of this Report and Recommendation to file written objections thereto.  *See also* Fed. R. Civ. 6(a), (b), and (d).  Any such objections shall be filed with the Clerk of Court.  Any request for an extension of time to file objections must be directed to Judge Kaplan.  A failure to file timely objections will preclude appellate review.  *See Thomas v. Arn*,

474 U.S. 140 (1985); *Wagner v. Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).